## BANK OF WASHINGTON v. NOCK.

1 An agreement made by a contractor about to furnish certain manufactured articles to the government that advances to be made by a bank to enable him to fulfil his contract shall be a lien on the *drafts* to be drawn by him on the government for the proceeds of the articles manufactured, does not give a lien on a *judgment* against the government for damages for violation of the contract; certain drafts having been drawn, and their proceeds received by the bank.

2. A subsequent agreement that the debt due to the bank for such advances, and also for any future ones to be made for the purpose of suing the government for non-fulfilment of its contract, shall be paid out of *any receipts* from the government, gives no right where a suit, though prosecuted, has resulted in an adverse judgment, even though a second suit have resulted successfully; this latter suit having been prosecuted under a new and special resolution of Congress, and by the aid of advances received from other parties; the bank, on the adverse judgment in the first suit, having refused to advance anything to prosecute the second.

3. A paper "renewing and reviving" the debt now, at the date of the paper, barred by the statute of limitations, for the balance of all the advances made in such a matter, whether to fulfil the contract or to prosecute the claim, does nothing more than keep alive the personal obligation. It gives no lien.

NOTE.—In this case the contractor, soon after the original agreement to advance, and when only a part of the advances were made, assigned a patent-right (for the delivery of products under which to the government his contract with the government was made) to the bank, with power to sell it if the advances were not paid when due. And the present case was a proceeding in equity to enforce a lien on a judgment which the contractor had obtained against the government for its breach of con tract with him, the bank having kept the patent-right twenty-seven years, and not offering by its bill to return it.

ERROR to the Supreme Court of the District of Columbia; where the case was thus:

The trustees of the Bank of Washington filed in May, 1867, a bill against Nock, complaining that in 1840, he having received a patent for a mail lock, made a contract with the Postmaster-General to furnish the government from time to time with the sort of patented lock, at a price stipulated, for the use of the government; that Nock, not having means at his command to manufacture the locks, agreed with the bank, if they would advance money for him, *on his drafts on the Postmaster*, or otherwise *on the proceeds to arise from his said contract*, to enable him to fulfil the same, that he would give them a specific lien on, and empower and authorize them to take out of *said drafts, when paid*, or *proceeds, whenever realized*, sufficient to repay to them the advances made, or to be made. The bill averred that under this arrangement they did make advances, and that Nock was so enabled to

fulfil his contract; but that for some reason but a small amount of the said proceeds were ever realized by Nock until lately; that he still owed the bank $8078.82.

That some time after the principal part of the advances were made, Nock executed an agreement, on the 2d of December, 1852, with the bank, to make to him further advances to *prosecute* his claim for payment; and that they did make such further advances; Nock agreeing that " the debt due by him to the bank for former advances, as well as the further advances then and thereafter to be made, for the purpose of *prosecuting his said. claim,* should be first paid out of any receipts realized by him from the government."

That Nock, on the 6th of January, 1865, by written obligation, which was in these words, and signed by him: " I hereby renew and revive my indebtedness and obligations to the Bank of Washington, arising out of certain advances made to me for drafts on the Postmaster-General of the United States in 1840, and all the accruing interest thereupon, as well as for any other advances which have been made to me, or which may be made to me, on any account whatever, by the said Bank of Washington," did acknowledge all his said debt for the advances, and all the interest accruing thereon, and formally renewed his obligation to pay the same.

That after a long prosecution of his said claim, Nock had recently been awarded by the Court of Claims the sum of $27,000, in satisfaction of the contract to furnish locks, and the same was now about to be paid, but that Nock, refusing to pay the bank its advances, or to recognize the specific lien which it had on the fund, or the validity of his contracts, especially that of the 2d December, 1852, was about to and was seeking to receive the money, and to appropriate it to his own exclusive use, in contravention of equity.

The answer and proofs, which, independently of the answer, were few, showed the patent-right, and the contract with the postmaster, as alleged; that for the purpose of executing the contract Nock had got the advances; that he had drawn several drafts on the Postmaster-General, in reduction

of them; that the drafts were all paid, and that the balance asserted remained unpaid. They showed, also, that about four months after the first sum of money advanced by the bank, Nock having now received about $3000 of advances, by an instrument dated June 6th, 1840, reciting the advances to that date, and reciting also his desire to secure, "by an assignment of the patent, in manner hereinafter expressed," payment not only of those advances but of all such further sums as might be thereafter advanced, transferred the patent to the bank, upon trust, in case of his failure to pay the bank the money advanced or to be advanced, as it became due, to sell the patent after sixty days' notice by advertisement, and reimburse itself.

The answer, which was not disproved on these points, further set forth that the government having annulled its contract with the respondent, he, for the purpose of procuring the means necessary to sue it in the Court of Claims, entered into the agreement of 1852; but that *that* prosecution resulted, A.D. 1864, in a judgment *adverse* to his claim. That desiring to begin a *new* suit against the government, and to get from the bank money to carry it on, he signed the paper of 1865; but that the bank had never advanced under that agreement but $100 (which the respondent professed himself ready to pay back), declaring that they had no confidence in his claim, and would never advance another cent; that the bank thus refusing to advance money to prosecute the case anew, it then became necessary for the respondent to make other arrangements to get money, and that by aid of these new arrangements with other persons, he procured an act of Congress referring his claim again to the Court of Claims, in which court, without any assistance from the bank, he prosecuted his claim anew, and after having laid out over $11,000 in doing so, got the award of $27,000, upon which the bank sought to fix a lien.

The answer expressly denied that the drafts which Nock drew were to be "any lien on the contract," though it admitted that they were founded on it, and made to enable the bank to receive pay for such locks as should be delivered,

and the testimony of the officer of the bank with whom Nock made his original arrangement said: "We made different advances at different times on drafts. The understanding was, that as soon as the locks were delivered we were to draw the money." The bank prayed an injunction against Nock's drawing the amount of the judgment from the treasury until it was first paid its advances.

The Supreme Court of the district at special term granted the injunction and directed an account; but at general term dismissed the bill, when the bank brought the case by appeal here.

*Messrs. Edward Swan and W. D. Davidge, for the bank:*

It is submitted that the lien of the bank upon the fund is too plain for controversy. Without adverting to the effect of the drafts and the assignment of the patent, the lien is expressly declared and established by the agreements of December 2d, 1852, and January 6th, 1865.

The lien being established, the jurisdiction of equity to enforce payment attached.*

*Mr. Morris, contra:*

The only lien really set up in the bill itself, notwithstanding its loose language—"or otherwise on the proceeds to arise from said contract"—is a lien on the drafts or their proceeds. The testimony of the officer of the bank who made the original arrangement, shows that this was the only lien thought of. All the drafts given were paid. The whole case, therefore, falls.

Independently of this, the alleged contract was made in 1840. Within four months of the first sum given, and while but a part of the money was yet advanced, Nock assigned his patent. That the patent had value is proved by the judgment in the Court of Claims for $27,000. It had value when assigned. This bill was filed in 1867. The bank has never offered to reassign. Nock could not, now, compel a reassignment. Had the bank sold, it could have

---

* Wylie *v.* Coxe, 15 Howard, 415.

retained the proceeds. This long retention of the patent—a retention for twenty-seven years—amounts to an appropriation of it for the advances. At all events, the bank should show that the security was exhausted. If it has held on to it till it has lost all value, it has no case for equity.

The agreement of 1852 don't keep alive a debt not sued for till 1867. And as an agreement to create one by its own force, the sufficient answer is, that the prosecution which it was meant to assert ended in an adverse judgment.

As to the paper of 1865, the whole consideration for it fails, the bank not having advanced money for the second suit, it being impossible to suppose that $100, which was all that was advanced under it, was what was meant to be advanced to prosecute a claim whose prosecution cost $11,000. Under pretence of an advance, its real purpose was to get an acknowledgment of a debt no longer capable of being enforced. And to use it for any purpose, would be to use it fraudulently. The lien, if the bank ever had any, was lost by the abandonment and refusal on their part to prosecute, or to permit means for the prosecution of the claim. And when thereon, upon his own resources—the bank having declared themselves unwilling to further prosecute, or to provide means for prosecution—Nock was left to proceed in his own way, they virtually accepted the then condition of the case, with an adverse judgment; and when thereafter Nock, with such assistance as was within his power, prosecuted the matter, he prosecuted it for his own benefit, and not for the benefit of the bank.

Mr. Justice CLIFFORD delivered the opinion of the court.

Advances were made by the complainants, as they allege, to enable the respondent to fulfil a certain contract which he had previously made with the Postmaster-General to furnish to that department a certain number of mail locks and keys for the postal service of the United States.

Prior to the date of the contract, to wit, on the sixteenth of July, 1839, the respondent had obtained letters patent for the lock to be furnished, as a new and useful improvement,

with the exclusive right to make, use, and vend the same, for the term of fourteen years, and on the first day of August following he received orders from the head of that department for two hundred locks and six hundred keys, to be constructed in accordance with his patent.

Before the respondent had filled that order, to wit, on the eighteenth of November of the same year, he received another communication from the Postmaster-General, informing him that he was authorized to make mail locks and keys for the Post-Office Department, of certain specified descriptions, and at certain specified prices, and that orders would be given for the quantities required from time to time, as they were wanted, payment to be made on the delivery of the articles, as ordered for the use of the government.

Wanting more means than he had at command, to enable him to perform his contract, the respondent applied to the bank for a loan, and the complainants allege that he agreed, in consideration that they would advance money for him on his drafts on the Postmaster-General, to give the bank a specific lien on the drafts and their proceeds, whenever the same should be realized, to secure and reimburse the corporation for the full amount of the advances so made or to be made, with interest until the principal should be repaid. Cash advances to the respondent were accordingly made by the bank, under and by virtue of that agreement, and the complainants allege that the advances so made enabled the respondent to fulfil his contract, and to supply the locks and keys for the postal service, as ordered by the department.

Drafts were drawn on the Postmaster-General for the contract price of the locks delivered; but the complainants allege that, for some reason unknown to them, they never received more than two hundred dollars of the proceeds, and that there still remains due and owing to them for the advances made by them, including interest, the sum of eight thousand and seventy-eight dollars and eighty-two cents; that on the second of December, 1852, the respondent entered into a written agreement with the corporation, that if they would make him further advances to enable him to

prosecute his claim against the government, the debt due by him to the bank, for the former advances, as well as the further advances to be made, should be first paid out of any sums he might realize for his claim for the breach of the contract, and that the whole amount of the debt due to the bank should be paid without any discount if the amount he realized of his claim exceeded by thirty-three and one-third per cent. the amount of his debt to the bank.

They also allege that the respondent, on the eighth of January, 1865, by a written instrument of that date, under his hand and seal, acknowledged all the advances so made to him, and renewed and revived his said indebtedness and obligations to the bank for the said advances.

Moneys were subsequently advanced by the bank for the respondent to the amount of one hundred dollars, and they allege that the Court of Claims awarded in his favor the sum of twenty-seven thousand dollars, in full satisfaction for the damages claimed by the respondent for the acts of the department in annulling his contract to furnish such locks and keys for the postal service, and that he neglects and refuses to pay his indebtedness to the bank, or to recognize their specific lien on that fund, but that he is seeking to appropriate the same to his own exclusive use, which, as they allege, is contrary to equity and in fraud of their legal rights. Wherefore they pray that the advances they made to the respondent may be decreed to be a specific lien on the amount recovered in that judgment, and they also pray for an account and for an injunction to restrain the respondent from receiving this amount from the treasury of the United States.

Process having been issued and served, the respondent appeared and admitted that he was the original and first inventor of the lock in question; that he received letters patent for the same as a new and useful improvement, and that he made a contract with the Postmaster-General to furnish the same to that department for the postal service of the United States; that he received an order under that contract for one thousand and forty locks and seven hundred and fifty keys;

that he subsequently filled the order, and that the proceeds thereof, except the sum of one hundred and fifty dollars, together with the proceeds of other parcels of the same patented lock and key, to the amount of fifteen hundred and ninety-three dollars and thirty-five cents, were paid to the bank; that all locks and keys manufactured and delivered under the contract were paid for by the department, except twelve hundred, which the Postmaster-General refused to accept, and which the respondent delivered to the bank, in whose possession they have ever since remained, unavailable to the respondent.

Fearful that the proceeds of the drafts would not be sufficient to satisfy the claim for the advances, the officers of the bank demanded further security, and the respondent alleges that thereupon he assigned to the corporation his whole interest in the letters patent for the lock in question, and that the bank continued to hold the same until the letters patent expired. He admits that he executed the drafts and that they were drawn to enable the bank to receive the proceeds of the locks and keys as manufactured and delivered to the department, but he expressly denies that there was any understanding or agreement that the drafts were to be a lien on the contract, as alleged in the argument of the appellants.

Separate defences are also presented to the subsequent agreements set up by the appellants, and in respect to that of the second of December, 1852, he alleges that the advances were made to pay for the services of an agent to procure an extension of the patent and to prosecute his claim against the government for the annulment of his contract; that they were not made a lien on the contract, as supposed by the appellants, and that the application for the extension of the patent was refused, and that the suit in the Court of Claims to recover damages for a breach of the contract resulted in an adverse judgment.

Apart from that defence he also alleges that the bank employed the same agent and agreed to give him one-third of whatever sum they might receive towards their claim, in

case the agent was successful in procuring the extension of
the patent, or the allowance of the claim.

In his answer the respondent also admits the execution of
the agreement of the sixth of January, 1865, but he alleges
that he never received under it more than one hundred dol-
lars, and that when he needed funds to enable him to prose-
cute his claim to a successful result, the appellants refused
to make him any advances, and informed him that they had
no confidence in his claim, and that they would not advance
him a dollar for that purpose.

By the order of the court the cause was referred to an
auditor, and he reported that the several advances made to
the respondent amounted to eight thousand seven hundred
dollars and thirty-three cents, and the court, at a special
term, on the fifth of August, 1867, entered a decree in favor
of the complainants for that amount. But the respondent
appealed to the full court in general term, where the decree
was reversed and a decree entered dismissing the bill of com-
plaint. Whereupon the complainants appealed to this court,
and still insist that their claim is a lien upon the judgment
recovered by the respondent against the United States in
the Court of Claims.

Liens existed at common law, and they usually arise by
statute or by contract, or by the usages of trade or com-
merce.\* Such a contract, if alleged, must be proved, and
when proved the rights of the parties depend upon the terms
of the contract.†

The complainants contend that their claim is a lien upon
the judgment recovered by the respondent, but he denies
that proposition and insists that he never entered into any
such contract. Before examining that question, however,
in its general aspect, it becomes necessary to inquire and de-
termine whether by the terms of the original arrangement
it was agreed and understood between the parties that the

---

\* Addison on Contracts, 1174; 3 Parsons on Contracts, 238.

† Randel v. Brown, 2 Howard, 406; Allen v. Ogden, 1 Washington's
Circuit Court, 174.

advances made by the bank to the respondent were to be a lien upon the contract made by the respondent to manufacture the locks and keys and deliver the same to the Postmaster-General, or whether those advances were only to be a lien on the drafts to be drawn by the respondent for the proceeds of the locks and keys so manufactured and delivered, after the proceeds became due and payable.

Evidently the views of the complainants cannot be sustained by virtue of the original arrangement, unless they had a lien upon the contract between the government and the respondent, as the drafts drawn for the proceeds have all been paid and adjusted to the satisfaction of all concerned. Suffice it to say on this point that the complainants do not allege in the bill of complaint that they had any lien upon the contract; and if they had done so the allegation would not be of any avail, as the answer expressly denies the existence of any such lien, and there is nothing in the proofs to sustain any such theory.

What they do allege is, that they had a specific lien upon the drafts drawn for the proceeds of the locks and keys manufactured and delivered, but it is not alleged that there were any such drafts outstanding and unpaid by the government, which were included in the judgment recovered by the respondent. On the contrary, it is alleged in the answer, and not denied by the complainants, that all the drafts drawn for locks and keys manufactured and delivered to the department were paid in full by the government.

Twelve hundred locks were manufactured, which were refused by the Postmaster-General, but the averment of the answer is, that they were delivered to the bank, and it does not appear that any draft or drafts for the contract price of those articles were ever drawn, presented, or refused. Such advances were made by the bank at different times, and one of the appellants testifies that the understanding was that they were to draw the money as soon as the locks were delivered, and that the orders were given to enable them to draw the money due for locks and keys furnished to the department; and the respondent testifies that the whole amount

due for the locks furnished was paid by the government either to him or to the bank.

Much of the respondent's indebtedness to the bank was contracted prior to the sixth of June, 1840, and on that day he assigned his whole interest in the letters patent to the bank, or to one of the appellants for the benefit of the bank, as security for such advances, with authority, in case he should fail to pay the same when the advances became due, to sell and dispose of the patent at public or private sale, first giving sixty days' public notice of such sale, as provided in the instrument of assignment.

Dissatisfied with the arrangement the department refused to give further orders for the locks and keys, and on the sixth of December, 1841, the department annulled the contract, and entered into a new contract with another party to supply the locks and keys for the postal service of the United States.

All the drafts drawn by the respondent for the proceeds of locks and keys furnished to the department had been paid, and he had no claim upon the United States except for the breach of the contract.

Suppose all these suggestions are correct, still the complainants refer to the agreement of the second of December, 1852, and insist that they are entitled to a decree by virtue of that instrument. Undoubtedly the effect of that instrument was to renew and revive the original promise of the respondent to pay to the bank any balance which he owed the corporation for those prior advances, but it did not have the effect to renew or revive any prior lien on the contract between the respondent and the government, because no such prior lien ever had any existence. It removed the bar of the statute of limitations, but its effect in all other respects was only prospective.

Briefly stated, the terms of the instrument are, that the bank shall advance such sums of money as they may think proper for the necessary costs and expenses in prosecuting the claim of the respondent against the government, and that he, the respondent, agrees, in consideration thereof, that

their debt against him, together with the sums so advanced, shall first be paid out of any receipts realized from the government. Certain advances were accordingly made for that purpose, an agent was employed, a suit was instituted in the Court of Claims, but nothing was recovered, and the result was an adverse judgment against the claimant. Both the bank and the claimant abandoned the prosecution of the claim, and nothing further was done in that behalf for the period of twelve years. Nothing in fact was ever done by the bank or the respondent under that agreement after the suit was determined in favor of the United States.

Conditioned, as the instrument was, that the debts of the bank were to be paid out of the receipts which they might collect from the government, our conclusion is, that the supposed lien never attached to the claim of the respondent, as nothing was ever collected. Beyond doubt he owes the debt, as he received the advances, but the question is whether the bank acquired any lien by virtue of that instrument, and our conclusion is that no lien was created by it, because nothing was collected from the government.

Years elapsed before the respondent made any further attempt to obtain damages for the refusal of the Postmaster-General to fulfil the contract. Some new powers had been conferred upon the Court of Claims, and the respondent employed a new agent, who succeeded in procuring the passage of a resolution by Congress, referring the matter again to the Court of Claims for their adjudication. Encouraged by this resolution he instituted a new suit in the Court of Claims, and on the sixth of January, 1865, he gave the bank another written agreement renewing and reviving his indebtedness and obligations arising out of certain advances made to him for drafts on the Postmaster-General, and for all accruing interest, as well as for any other advances which have been or may be made by the said bank.

Reference is made by the plaintiffs to this instrument as showing a lien on the judgment in question in behalf of the complainants, but it is quite clear that the language of the instrument will not admit of any such construction. Un-

questionably it is a new promise, but it contains no language whatever to support the theory that the parties intended that it should have the effect to create a lien in favor of the bank upon the claim of the respondent against the United States.

Special reference is made in the instrument to the advances made for the drafts drawn on the Postmaster-General, not as creating or recognizing any lien on the original contract, but as descriptive of the indebtedness and obligations which it was the purpose of the respondent to renew and revive.

Two indorsements were made on the instrument, to wit, one for sixty dollars and the other for forty dollars, and it is true that those indorsements contain the recital that those sums were advanced in aid of the claim of the respondent, and that the appellants, as trustees of the bank, have an interest in the claim, but it is not there stated, even if the indorsements are competent evidence, what their interest is, nor that they have any other or greater interest than other creditors.  They do not pretend that they advanced more than those two sums under the last agreement, and they admit that the respondent several times applied to them for money, and that they refused to supply his wants, which fully supports the allegations of the answer.

His theory is that they agreed to advance what was necessary to pay the expenses in the new prosecution of the claim, but the complainants deny that proposition, and insist that they let him have all they agreed to furnish, and if that allegation is true it affords strong ground to conclude that the instrument under consideration never was intended to create any such obligations as is supposed by the appellants.  But if it will admit of such a construction then it is clear that the complainants cannot recover, as they never fulfilled the contract.  They never advanced but one hundred dollars, and it is past belief that either party ever supposed that the expenses of prosecuting the claim to a successful result would not exceed that sum.

DECREE AFFIRMED.